# IN THE UNITED STATES DISTRICT COURT DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| **YVONNE FLITTON,** | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| **Plaintiff,** | |
| **vs.** | |
| **PRIMARY RESIDENTIAL MORTGAGE, INC.** | **2:03CV481DAK** |
| **Defendant.** | **Judge Dale A. Kimball** |

The Court conducted a Bench Trial in this matter on November 18 and 19, 2008.  Plaintiff, Yvonne Flitton ("Flitton"), was represented at trial by Blake S. Atkin and John V. Mayer, of Atkin Law Offices.  Defendant, Primary Residential Mortgage, Inc. ("PRMI"), was represented at trial by Darryl J. Lee and Richard J. Armstrong of Wood Crapo LLC.  Having heard the testimony of the witnesses, considered the evidence, and heard and considered the arguments of counsel, and being fully advised, the Court enters the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

1.      Flitton was employed by PRMI from July 2000 through October 11, 2002.  For the majority of her tenure at PRMI, Flitton was the head of PRMI's Wholesale Division.

2.      At the time Flitton was terminated, she claimed to have built a platform that was capable of handling at least double, and maybe three times the volume.

3.      In her first full year at PRMI, she led the Wholesale Division to net earnings of $1,000,000.00.

4.      PRMI terminated Flitton's employment on October 11, 2002.

5.      Prior to joining PRMI, Flitton was employed in the mortgage industry by a number of companies as outlined in the chart below:

| EMPLOYER | EMPLOYMENT DATES |
|---|---|
| First Plus Freedom Mortgage | August 1995 to February 1999 |
| High Gate Funding | February 1999 to July 1999 |
| Meritage Mortgage | July 1999 to September 1999 |
| Aames Home Loans | October 1999 to July 2000 |

6.      At the end of Flitton's employment with First Plus Mortgage, she was earning $8,000 to $9,000 a month.

7.      When Flitton was employed at High Gate Funding, she was paid between $9,000 and $10,000 a month.

8.      In 1999, Flitton earned $17,429.16 from Meritage Mortgage.

9.      In 1999, Flitton earned $14,945.94 from Aames Home Loans.

10.     In 2000, Flitton earned $43,043.28 from Aames Home Loans.

11.     In 2000, Flitton earned $41,771.68 from PRMI.

12.     In 2001, Flitton earned $142,815.48 from PRMI.

13.     Within days of her October 11, 2002 termination, Flitton was negotiating with Kevin Gates, the owner of New Freedom Mortgage, to head-up a brand new Wholesale Division for New Freedom.

14.     Flitton had six to eight negotiation sessions with Mr. Gates regarding this new position.

15.     Flitton was formally hired by New Freedom on November 4, 2002, to head-up its new Wholesale Division.  That new division would be dealing with the same types of loans that Flitton was managing while at PRMI.

16.     As part of her negotiations, Flitton agreed to a compensation package which included a $5,000 per month base salary, plus 25% of the profits of the Wholesale Division. Flitton understood that the 25% of profits portion of her compensation dealt with net profits after the loans that the Wholesale Division obtained were sold to investors.

17.     Very shortly after Flitton began her new position as head of the Wholesale Division at New Freedom, she hired Wendy Miller and Mike Simmons, two of her lieutenants from PRMI.  Shortly thereafter, she hired a number of other employees who had worked for her at PRMI in the Wholesale Division there.

18.     When taking the position at New Freedom, Flitton knew that it would take a number of months to start generating net profits of the Wholesale Division.  She agreed to take home smaller paychecks during the formative months because of the potential income once the Wholesale Division built its platform and started selling loans.

19.     After heading-up the new Wholesale Division at New Freedom for almost three months, Flitton resigned that position effective January 31, 2003.

20.     Flitton gave several reasons why she quit her job as the head of the new Wholesale Division at New Freedom.  Flitton stated that she left because of the business model created by New Freedom's senior managers and the restrictions on the types of loans that her division could sell.  She claims that New Freedom management shifted her focus to second mortgages and prohibited out of state broker business.  This shift would require many more loans for the division to successfully reach the limits she had discussed with Gates.  She also stated that New Freedom's

3

senior management did not like the subprime loans with which she was dealing. Flitton felt that it was a battle everyday to get what she needed to do her job. Moreover, Flitton testified that after her experience at PRMI she was insecure and she did not feel that she could question management decisions.

21.     Ten days later after Flitton quit, Flitton was rehired by New Freedom as the head of her own retail net branch office for New Freedom. As a retail net branch, Flitton began dealing with all types of paper, including conventional, government, subprime and A paper, as well as originating loans in other states. She actually began going out to borrowers directly with respect to loans.

22.     This new job with New Freedom was in an area where Flitton had little experience. She had not done retail loans since 1994. As the head of a retail net branch for New Freedom, Flitton was paid on a straight commission basis, but she did receive a $5,000 a month draw against commissions.

23.     On June 11, 2003, New Freedom sent Flitton a letter terminating her for problems associated with an audit. Flitton did not want to dispute the audit findings. She spoke to Kevin Gates and he agreed to let her resign.

24.     Immediately after Flitton left New Freedom in June 2003, Flitton went to work for her husband's company, American Residential Mortgage. American Residential Mortgage was a small mortgage company that dealt primarily with the retail side, making direct contacts with borrowers and finding them mortgage loans.

25.     Flitton agreed to work for American Residential for $2,500 a month base salary plus 25% of the company's profits. Although she was an owner, the company elected not to

4

distribute any profits to Flitton or other owners.  In addition to her monetary compensation, American Residential paid for two vehicles, one for Flitton and one for her husband.

26.     Between June 2003 and February 2004, Flitton looked for employment on the internet but she never contacted anyone.

27.     Flitton worked at American Residential Mortgage from June 2003 until September 2005.  During some of her employment with American Residential, Flitton was not emotionally capable of working a full, forty-hour week.  She testified that she intended to put in a full day everyday but sometimes she emotionally could not do it.

28.     In October 2005, Flitton went to work for Wells Fargo, where she worked for only a short time.  She then looked for a company with better benefits.  She gained employment at Homecomings Financial in February 2006.  She stayed at Homecomings Financial until August 2007.  During that time, she obtained a mortgage brokers license.

29.     After obtaining her mortgage brokers license, she worked for American Residential again to get experience with a few loans.  She then obtained a position with Envision Lending in January 2008.  At the time of trial, Flitton was still employed at Envision Lending and her salary had risen to $30,000 per month.

30.     Between October 11, 2002 and the date of trial, Flitton has been employed by six different companies, namely, New Freedom Mortgage, American Residential Mortgage, Wells Fargo Financial, Homecomings Financial, American Residential Mortgage a second time, and Envision Lending.

31.     After October 11, 2002, PRMI acquired information that it claimed at trial would have resulted in Flitton's termination had PRMI known of the information on October 11, 2002.

32.     On December 17, 2002, GMAC Residential Funding ("RFC") notified PRMI and its Wholesale Division that it had "significant concerns" with respect to a residential loan to an individual named Zakee Ali ("Ali Loan").

33.     RFC informed PRMI that "[a]t the time of origination the borrower indicated she would occupy the subject property at the time of origination" and that through RFC's investigation it was discovered the borrower has not occupied the subject property as her primary residence."

34.     Before the Ali Loan was offered to RFC for purchase, PRMI's Wholesale Division offered the loan to Countrywide Home Loans ("CWHL"). CWHL, however, declined to purchase the loan because the property was "non-owner occupied" when it closed as an "owner occupied" property.

35.     When the Ali Loan was rejected by CWHL and sent back to PRMI's Wholesale Division, Flitton wrote on an internal "Declination Summary" that she would now send the loan "to New Century for kicks."  The Ali Loan, however,  was sold to RFC instead of New Century. RFC was a big investor in PRMI's wholesale division.  The Ali Loan was sold to RFC as an "owner-occupied" property loan, despite CWHL's statement that the loan was not owner-occupied.

36.     Kori Seely, Vice President of Quality Control at PRMI provided no direct evidence that Flitton was involved in redirecting the loan to RFC.  She stated only that Flitton had seen the loan after it returned from CWHL and that she had stated that the loan should be sent to New Century.  David Zitting, Chief Executive Officer and President of PRMI, testified that Flitton's handwriting on the declination summary, PRMI05729, indicates that Flitton was responsible for

redirecting the Ali Loan once it was rejected by CWHL.  However, there was no direct evidence that she personally redirected the loan to RFC.

37.      David Zitting testified that had he known about Flitton's conduct in relation to the Ali Loan prior to October 11, 2002, PRMI would have terminated Flitton's employment on that basis alone.   The court, however, does not find his testimony convincing.  Substantial evidence was presented that similar mistakes on loan documents were made by several employees and employees were not immediately terminated for the mistakes.  Flitton credibly testified that it would be impossible to run the division and oversee every detail of every loan.  The testimony presented did not support a finding that an immediate termination would have occurred.

38.      PRMI presented other testimony that prior to October 11, 2002, Flitton signed an indemnification agreement with CWHL in relation to a residential loan to an individual named Robert Bradley ("Bradley Loan").   Prior to October 11, 2002, the only employee at PRMI authorized to sign indemnification agreements with investors was David Zitting.

39.      After Flitton signed the indemnification agreement and after her employment was terminated, on February 19, 2003, CWHL notified PRMI that the Bradley Loan was closed in violation of the investor's guidelines governing seller contributions.  The investor's repurchase notice to PRMI stated: "The HUD-1 Settlement Statement indicated that the seller paid $5,000 (or 5.6%) of the borrower's closing cost" when the investor's guidelines "limits the maximum seller contributions to 3%."

40.      Investor guidelines are set by investors which set forth the investor's underwriting practices, "basically what types of loans they are going to take, what the parameters are for approval of those loans."  The guidelines are published.  As the head of the PRMI's Wholesale

Division, Flitton had the ultimate responsibility in relation to knowing what the investor's

guidelines were on seller contributions prior to authorizing the payment of those contributions.

41.     Flitton expressly authorized the payment of "up to 6% in closing costs" to be paid

by the seller.   Flitton's handwriting appears on the internal loan approval sheet.

42.     David Zitting testified that he did not know Flitton had signed the indemnification

agreement in relation to the Bradley Loan.  Steve Chapman, however, signed the check for the

indemnification agreement.  Therefore, upper management was aware of the agreement.  The

court does not find that Flitton's conduct in signing the indemnification agreement in relation to

the Bradley Loan was a material breach of her employment agreement with PRMI.  The court also

does not find that  Flitton's conduct in relation to the Bradley Loan was severe enough to warrant

her immediate termination had Zitting known about it prior to October 11, 2002.

43.     In July 2004, Scott Peterson, the Vice President of the Wholesale Division, left the

company, and PRMI consolidated and merged the position under the authority and responsibility

of Sadie Young, PRMI's Vice President of Retail.  David Zitting also assumed additional

oversight over the Wholesale Division.  The Vice President of Wholesale position was not filled.

There is, however, no evidence regarding how long the position would have remained had Flitton

remained with the company.

44.     In addition, there is no evidence as to whether she would have been reassigned to

another position within PRMI when PRMI closed its Wholesale Division on December 31, 2005

because of lower yields and ever-increasing risks.

45.     Flitton has suffered from anxiety and depression for many years, dating back to at

least 1992 when she was first prescribed with anti-depressants.  In 1996, prior to joining PRMI,

Flitton suffered anxiety attacks, which at times, resulted in debilitating chest pain, dizziness, head

aches, shortness of breath and even distortions in hearing, loss of focus and ability to maintain

attention.  In December 1999, Flitton visited her doctor, Dr. Boam, who diagnosed Flitton with

both depression and anxiety.

46.     From at least 1992 until the present, Flitton has been prescribed with and has taken

various medications for anxiety and depression, including without limitation, Prozac, Paxil,

Xanax, Wellbutrin, Zoloft, Topomax and Lexapro.

47.     In the summer of 2002, before PRMI terminated her, Flitton believed that the

causes of her anxiety and depression were centered on the fact that she was the sole breadwinner,

responsible for supporting a family of ten.

48.     Flitton also testified that she was emotionally and psychologically affected by her

termination from PRMI.  She lost confidence in her ability to get a job given that she had to

inform potential employers that she was terminated.  She also began having difficulties trusting

supervisors at work.

49.     Other than receiving prescription medications from her family physicians, Flitton

did not see a medical professional who specialized in these illnesses until September 2003, when

she began seeing a clinical social worker. Flitton first started suffering debilitating symptoms

which she attributed to her depression in approximately May/June 2003.

50.     Flitton prepared an estimate of her alleged damages, making various assumptions

regarding projected sales at PRMI's Wholesale Division after her termination.  Flitton made

calculations through 2022.

51.     Flitton had available to her PRMI's actual sales data for the Wholesale Division

from the date of her termination through December 2005, but she did not use them because they

would not reflect the work she believed that she could perform in the position.  She was replaced by someone who had been her junior while at PRMI and she was not impressed with his work.

52.     Flitton, through her attorneys,  provided her calculations to her financial damages expert, Richard Free.  Free used twenty years in calculating his front pay analysis.  The court, however, finds that he did not provide an adequate basis for using twenty years.  He did not consider Flitton's age, how often baby boomers change jobs, or how often senior managers at mortgage companies change jobs.  In addition, he did not analyze or evaluate Flitton's employment history before she joined PRMI.  Free was not aware that Flitton had worked for at least three different mortgage companies in the two years prior to joining PRMI.

53.     Although PRMI challenges the work Free did, Free testified that he recomputed Flitton's numbers and performed his own analysis.  Free testified as to the basis for some of the computations.

54.     Free's report suffers from some faulty methodology.  Free did not consider economic trends, such as the risks associated with growth and profitability or the probability of achieving his projected growth trends.  Free's report failed to consider, explain, or justify product trends, such as the subprime demise.  His use of the CPI as a "discount rate" is not an appropriate discount rate since it only measures inflation to consumers.

55.     While Free's report did not consider post termination events such as PRMI's elimination of the position of Vice President of Wholesale in July, 2004 and the ultimate shut down of the Wholesale Division at PRMI at the end of 2005, there is no evidence that either event would have resulted in Flitton's loss of employment with PRMI had she still been with the company.

56.     F. Wayne Elggren, PRMI's financial damages expert, prepared a comprehensive damages analysis, evaluating Flitton's earnings history and potential, using the actual sales data of PRMI's Wholesale Division after Flitton's termination.

57.     Elggren first calculated Flitton's historic earning capability, by examining what she earned during the four years prior to her termination, namely 1998 through 2001.  Using Flitton's own testimony and documentation, Elggren determined that Flitton was capable of earning $111,626 a year in her chosen profession.  This amount, however, did not take into consideration the effects of FLitton's termination.  As was demonstrated through the evidence in this case, a termination can have serious impacts on the earning capabilities of an individual.  The person is put in a position of quickly finding replacement employment and they also have the stigma of explaining a termination to potential employers.  Elggren failed to factor any of these considerations into his historic earning capability.  Therefore, the court finds that Elggren's calculation of Flitton's historic earning capability is inflated by fifteen percent.

58.     Compensation for mortgage banker executives typically increased during the relevant time period by 7.4% over the prior year, so Elggren increased Flitton's earning capability by that percentage for each year after her termination.   The court finds this increase reasonable except for the fact that Elggren applied it to Flitton's historic compensation but did not similarly apply it to what she would have earned at PRMI.  The court believes that it should have been applied equally.

59.     Elggren reviewed Flitton's tiered commission structure in effect at the time of her termination and evaluated it against the actual loan sales for PRMI's Wholesale Division from October 2002 through December 2005.  Using the actual loan sales data, as well as Flitton's tiered commission structure, Elggren calculated the commissions Flitton would have earned on actual

11

loan sales before the entire Wholesale Division was closed on December 31, 2005.  The actual

loan sales, however, are not reflective of Flitton's work.  While the court does not find that the

actual sales should be entirely disregarded because they reflect market conditions, there was

evidence that she was a better manager and more productive worker than the person who replaced

her.  Therefore, the court believes that the actual sales figures would be accurate for purposes of

the damages calculation if they were increased by ten percent.  This increase also offsets Elggren's

failure to equally apply the 7.4% increase to Flitton's expected compensation at PRMI while

applying it to her historic compensation.

60.     Elggren then evaluated the commissions Flitton would have earned from her

termination until December 31, 2005 at PRMI, added her $5,000 base salary, and deducted from

that sum the historic compensation earnings Flitton could and should have earned post

termination.  He then calculated Flitton's cumulative lost compensation resulting from her

termination at PRMI for all dates between her termination date of October 11, 2002 through the

closure of PRMI's Wholesale Division on December 31, 2005.

61.     Again, Elggren's analysis of what Flitton should have been able to make failed to

consider the difficulties she faced in finding another management level position in the industry

once Flitton had to inform potential employers that she was terminated from PRMI.  The evidence

at trial demonstrated that Flitton struggled to find something that matched the position she was in

at PRMI because she was terminated.  The court believes that this struggle was not a failure to

mitigate damages but rather the result of her inappropriate termination.

62.     Flitton's employment at New Freedom as head of its new Wholesale Division was

not comparable to her position at PRMI.  She was not in management, she had no employees,

there was no business model in place, and the pay was lower.  Flitton's compensation package

involved significant investment and risk in building the new division.  She took the position because she was desperate for a new job and needed at least a base salary of $5,000 per month.

63.     While PRMI criticizes the positions of employment that Flitton obtained after her termination, the court finds that Flitton used whatever skill sets she had in trying to find employment.  PRMI seeks a finding that Flitton chose a new career, but each of her positions are within the same industry.

64.     Flitton testified that experience working as a sales executive after having a management position was hard as a matter of pride.  Nonetheless, she has broadened her experience within the industry and has obtained a mortgage broker's license which will benefit her in the long term.  In addition, with her mortgage broker's license, her current salary is exceeding her salary at PRMI.  Although Flitton's termination may have hampered her short term ability to find employment, there is no evidence that it continues to be a stigma.

65.     The court finds that  Flitton is entitled to back pay damages between her termination from PRMI on October 11, 2002 and the time that she received her mortgage broker's license in August 2007.  She obtained her mortgage brokers license at approximately the same time that the subprime industry ended.  PRMI had closed her Division in December 2005.  While the court believes that had she been employed with PRMI at the time that she may have been moved to other type of work, she still may have also chosen to gain her mortgage broker's license and move to another employer.  Prior to obtaining her employment, Flitton switched employers often.  While she testified that she intended to remain at PRMI because it was her dream job, the court finds that changes in the market may have led her to find other employment by August 2007.  Since Flitton obtained her mortgage broker's license, she has been able to increase her salary to a level that is comparable, or exceeds, what she would have been making at PRMI.

13

## CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact, the Court makes the following conclusions of law:

1.     The burden of proof in this case is on the Plaintiff.  Flitton has proven by a preponderance of the evidence that she is entitled to back pay damages, but she has not proven that she is entitled to front pay damages.

2.     The first jury trial in this matter resulted in a verdict finding that PRMI's termination of Flitton's employment on October 11, 2002, was retaliatory.  Nothing in the jury verdict of the second trial diminishes from the first jury's finding of retaliation.  The second jury did not make a finding that Flitton's termination was based on legitimate, nondiscriminatory reasons.  The second jury merely found that the termination was not discriminatory.  Because PRMI's termination of Flitton was retaliatory, she is entitled to an award of back pay and/or front pay at the discretion of the court.

3.     A plaintiff in a Title VII action must take all reasonable steps to mitigate her damages.  One of the principal requirements is that a plaintiff must seek comparable employment. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S. Ct. 3057, 3065 (1982); *Cleveland Branch, NAACP v. City of Parma,* 263 F.3d 513, 530 n.17 (6th Cir. 1982); *Heilbling v. Unclaimed Salvage and Freight Co.*, *Inc.,* 489 F. Supp. 956, 963-64 (E. D. Pa. 1980).

4.     A plaintiff who is entitled to back pay damages may be entitled to compensation for the period between the termination date and the date she obtains comparable replacement employment.  Once comparable employment is found, the damages cease.  *Ford Motor Co.,* 458 U.S. at 234-35; *Sims v. Mme. Paulette Dry Cleaners,* 638 F. Supp. 224, 230 (S.D.N.Y. 1986).

5.      The court finds that Flitton's termination on October 11, 2002, caused her serious difficulties in trying to find comparable employment.  Flitton sought and obtained many new positions in her attempts to find comparable employment.  Therefore, she mitigated her damages to the extent that she could given the circumstances.  The court has found that none of her subsequent positions were comparable until she began at her current position with Envision Lending.

6.      Flitton voluntarily quit her job as the head of New Freedom's Wholesale Division on January 31, 2003.  Flitton was not fired at that time, nor was the business closed.  Her decision to quit a position that was not comparable to her position at PRMI, however, does not constitute a "willful loss of earnings."  After making that decision, she steadily continued to find employment. Flitton's subsequent positions of employment were not comparable to her position at PRMI. Again, the court notes that she experienced difficulty as a result of the stigma of being terminated and the emotional distress the termination caused her.  These subsequent positions, however, were consistent with her experience, some taught her additional skills that are valuable within the industry, and she continued to progress within the industry.  The court cannot conclude that she removed herself from the industry and attempted to begin a new career until such time as she gained her mortgage broker's license.

7.      Therefore, the court concludes that Flitton is entitled to back pay damages for the period between her termination on October 11, 2002 and August 2007 when she gained her mortgage broker's license and began seeking employment in that regard.  Her mortgage broker's license enabled her to gain her current position with Envision Lending where she has reached an income level superior to PRMI.

15

8.      The court finds no basis for awarding front pay damages.  Flitton is currently in a position that exceeds her earning potential at PRMI.  While she testified that she does not enjoy the position as much as PRMI, she has valuable experience, broad skills within the industry, and a mortgage broker's license.  The court also finds that any stigma that kept her from finding employment in the few years after her termination has ended.  Moreover, the demise of the subprime industry would have likely impacted her even if she had remained at PRMI.  The industry changes coupled with Flitton's transient employment history prior to joining PRMI, suggests that Flitton would have likely left PRMI during the subprime crisis.  The court finds no basis for finding that Flitton will suffer damages from her termination into the future.  Therefore, the court denies an award of front pay damages.

9.      Although PRMI has challenged the expert report of Richard Free under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, the court declines to strike the report.  The court has considered it and given it the weight it believes it warrants.  The court concludes that Wayne Elggren's financial damages report complies with Rule 26 of the Federal Rules of Civil Procedure, and the court has considered it in calculating Flitton's damages.

10.      The court has calculated Flitton's back pay damages by adding ten percent to Flitton's PRMI compensation from October 2002 to December 2005.  The court has also decreased Flitton's historic compensation by fifteen percent for the reasons provided in the findings of fact.  For Flitton's PRMI compensation from December 2005 until August 2007, the court has added ten percent to the compensation she would have received on sales figures of $14,482,693.  That sales figure is PRMI's sales figure from October 2005, which the court finds to be the average sales month in the six months prior to the closure of PRMI's Wholesale Division.  Therefore, her PRMI compensation would be $16,506.60.  For Flitton's historic

16

compensation from December 2005 until August 2007, the court has used an average of Flitton's actual compensation for those months, which equals $12,022.05.  Based on these calculations, the court the court awards Flitton back pay damages from October 2002 until August 2007 in the amount of $304,703.05.

## <u>ORDER</u>

After considering all of the evidence and the law as it applies to this case, the court directs the Clerk of Court to close the case and enter judgment against PRMI and in favor of Plaintiff, Yvonne Flitton, in the amount of $354,703.05, which represents back pay from October 11, 2002, the date of her termination, and August 2007, and $50,000 in emotion distress damages awarded to plaintiff by the first jury in this matter.

DATED this 13th day of January, 2009.

BY THE COURT:

DALE A. KIMBALL
United States District Judge